IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA


| | |
|---|---|
| ADRIENNE SCOTT,<br>　　Plaintiff,<br><br>　　v.<br><br>SUNOCO LOGISTICS<br>PARTNERS, LP, et al.,<br>　　Defendants. | :<br>:<br>:　　CIVIL ACTION<br>:　　NO. 11-6284<br>:<br>:<br>:<br>: |

**January 8th, 2013**　　　　　　　　　　　　　　　　　　　　　　　　Anita B. Brody, J.


## MEMORANDUM

Plaintiff Adrienne Scott brings suit against Defendants Sunoco Logistics Partners, LP ("Sunoco"), Kimberly Legge, and Michelle Achenbach. Scott alleges that Sunoco subject her to disparate treatment and retaliated against her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. Ann. § 951 *et seq.*, and 42 U.S.C. § 1981.[1] Additionally, Scott alleges that Defendants Legge and Achenbach ("Individual Defendants") aided and abetted Sunoco's discrimination and retaliation in violation of the PHRA, 43 Pa. Stat. Ann. § 955(e), and should

---

[1] "[T]he substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII." *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009). Additionally, the legal standards for analyzing Title VII and PHRA claims "are the same for purposes of determining [a] summary judgment motion." *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 409 (3d Cir. 1999). With the exception of the PHRA and § 1981 claims brought against Individual Defendants, this opinion will only reference Title VII because any result reached under this statute applies equally to Scott's claims under § 1981 and the PHRA.

1

be held personally liable for their discriminatory conduct under § 1981.[2] Sunoco brings counterclaims for conversion and unjust enrichment against Scott. I exercise federal question jurisdiction over Scott's Title VII and § 1981 claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Scott's PHRA claims and Sunoco's counterclaims pursuant to 28 U.S.C. § 1367.

Sunoco has filed a motion for summary judgment, seeking judgment in its favor on all of its counterclaims and against Scott on all of her claims. For the reasons set forth below, I will grant Sunoco's motion for summary judgment against Scott on all of her claims, and deny Sunoco's motion for summary judgment in its favor on all of its counterclaims.

## I. BACKGROUND[3]

Adrienne Scott is an African American female. On April 7, 2005, Sunoco hired Scott to work as an Administrative Clerk in the Maintenance Department at its Fort Mifflin facility. Defs.' Ex. C. From the start of Scott's employment until October 2008, Mike Raikos was Scott's immediate supervisor. Defs.' Ex. A at 56:7-9, 57:11-12. On January 1, 2009, David Haygood became Scott's immediate supervisor and remained her supervisor throughout the rest of her time at Sunoco. *Id.* at 58:1-11. Scott had the only administrative position that reported to Raikos and Haygood. *Id.* at 62:17-67:18, 201:3-8. Raikos and Haygood also served as the immediate supervisors to the pipeliners. *Id.* at 56:16-24, 109:1-8. Scott's job was to support the pipeliner

---

[2] In her response to Sunoco's motion for summary judgment, Scott fails to respond to Sunoco's arguments in favor of granting summary judgment against Scott on her § 1981 claims against Individual Defendants. Furthermore, Scott's response fails to even mention her § 1981 claims against Individual Defendants. Thus, Scott has abandoned these claims by failing to address them in her response to Sunoco's motion for summary judgment. *See Glenn v. Raymour & Flanigan*, 832 F. Supp. 2d 539, 547 (E.D. Pa. 2011) (deeming claims abandoned when the plaintiff failed to address them in response to the defendant's motion for summary judgment); *Seals v. City of Lancaster*, 553 F. Supp. 2d 427, 432-33 (E.D. Pa. 2008) (same); *Hackett v. Behavioral Health*, No. 03-6254, 2005 WL 1084621, at *6 (E.D. Pa. May 6, 2005) (same).

[3] For purposes of summary judgment, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (alteration in original) (internal quotation marks omitted).

2

group. *Id.* at 59:2-5. Scott's official hours of work were 7:30 a.m. to 4:00 p.m. *Id.* at 59:6-7. The pipeliners' official hours of work were 7:00 a.m. to 3:30 p.m. *Id.* at 60:2-4. Unlike Scott who worked in the office, the pipeliners, who were all male, worked in the field on the pipeline. *Id.* at 60:5-8; 108:21-24.

During her tenure at Sunoco, Scott was the only Administrative Clerk that worked at Fort Mifflin. *Id.* at 61:24-62:4. There were several Administrative Assistants that worked at Fort Mifflin. *Id.* at 62:17-66:7. The Administrative Assistants who worked for Sunoco received higher pay than the Administrative Clerks. *Id.* at 62:7-14. Additionally, the Administrative Assistants that worked at Fort Mifflin had different hours than Scott—they worked from 8:00 a.m. to 4:30 p.m., and they had different supervisors than Scott. *Id.* at 62:17-66:16.

Until 2008, Scott's time at Sunoco was largely uneventful. After the beginning of 2008, Scott no longer received invitations to vessel dinners. *Id.* at 153:15-154:3. Vessel dinners occurred when a client of Sunoco invited Sunoco employees to dinner. *Id.* at 152:20-23. Failure to receive invitations to these dinners did not affect the terms and conditions of Scott's employment, but she didn't get to go out to dinner. *Id.* at 157:4-11.

Additionally, in 2008, Scott reported to Raikos that she had been intimidated by another employee, Peggy Vernacchio. *Id.* at 80:9-18. Raikos reported the incident to Human Resources Manager, Michelle Achenbach. Scott reported to Raikos and Achenbach that, after asking Vernacchio a question, Vernacchio "became in [Scott's] space" and informed Scott that she should do what she was told, regardless of the assignment. *Id.* at 81:6-82:23. Scott never reported to Raikos or Achenbach that Vernacchio had discriminated against her on the basis of race or gender. *Id.* at 80:22-81:1, 82:12-82:23. This is because Scott's complaint about the

3

incident with Vernacchio was a "complaint of intimidation" and "was not a complaint of harassment or discrimination or retaliation." *Id.* at 96:7-13.

When Haygood took over for Raikos, he treated Scott different than the pipeliners. *Id.* at 108:12-24. He would allow the pipeliners to leave work early or go to a dentist's without taking time off, and he would allow them to change schedules, but he would not allow Scott to do any of these things. *Id.*

In April 2009, Scott applied for an Administrative Assistant position. *Id.* at 145:18-22. The job duties of the Administrative Assistant included, providing administrative support to the Area Manager and Operations Manager in the areas of budgeting and expenses. Defs.' Ex. H. Scott had a business degree in business administration, but her only work experience in finance or budgeting was "help[ing] Mr. Haygood a little bit with his budget." Defs.' Ex. A at 146:13-147:1. Scott was not interviewed for the position. Defs.' Ex. A at 147:5-6. Kimberly Legge, Area Projects Manager for Sunoco, made the decision to hire Joan Hassett, a white female, for the position. Defs.' Ex. A at 66:12-13; Defs.' Ex. I. Hassett had ten years experience as an administrative assistant in a corporate environment. Defs.' Ex. I. Additionally, Hassett had budgeting experience, which she acquired during her work as an administrative assistant in the financial services and insurance industry prior to her hire at Sunoco. Defs.' Ex. I.

In 2009, Scott became pregnant. Defs.' Ex. A at 159:14-16. She prematurely gave birth in March 2010. *Id.* at 159:17-18. During the pregnancy, Scott took a leave of absence for some period of time due to complications with the pregnancy. *Id.* at 159:19-22. Scott never told any of her co-workers, with the exception of Haygood, that she was pregnant. *Id.* at 161:17-21. After giving birth in March 2010, Scott took maternity leave. *Id.* at 68:13-14. During her maternity leave, Sunoco hired a temp worker to fill her position. *Id.* at 68:6-15.

On June 8, 2010, Scott applied for a paralegal position at Sunoco. *Id.* at 141:23-142:13. One of the requirements of the position was five to ten years of corporate/securities law paralegal experience in a corporate law department or law firm. Defs.' Ex. J. Scott does not have any paralegal experience. Defs.' Ex. A at 141:23-24. On June 16, 2010, Scott received an email from Marci Donnelly, informing her that she was not selected for an interview because "other candidates had more job-related experience." Defs.' Ex. K. Sunoco hired Dawn Womack, an African American female, for the paralegal position. Defs.' Ex. L. Womack had approximately nineteen years of corporate/securities law paralegal experience. Defs.' Ex. M.

On June 22, 2010, after returning from maternity leave, Scott received two written warnings from Haygood, the first dated March 9, 2010 and the second dated June 21, 2010. Defs.' Ex. D; Defs.' Ex. E. Because Scott had left for maternity leave in March 2010, she did not receive the March 9, 2010 warning until June 22, 2010. Defs.' Ex. A at 137:4-14.

The March 9, 2010 warning stated that Scott had failed to communicate with her peers prior to a scheduled absence and that her co-workers were unable to complete outstanding tasks due to her failure to communicate. Defs.' Ex. D. Additionally, the warning stated that Sunoco had lost the opportunity to purchase valuable equipment due to an outstanding check that Scott had responsibility over. *Id.* Moreover, the warning noted that Haygood had addressed Scott's issues with timeliness and communication on two earlier occasions. *Id.*

The June 21, 2010 warning stated that Scott had been late four out of five days in the previous week. Defs.' Ex. E. It reminded Scott that Haygood had spoken with her about her required work hours on June 1, 2010 and had discussed Scott's timeliness on two earlier occasions, and during her 2009 performance review. *Id.*

The two warnings were placed in Scott's personnel file. Defs.' Ex. A at 135:11-13. However, they did not affect Scott's salary, result in any change in benefits, or otherwise impact any of the terms and conditions of Scott's employment with Sunoco. *Id.* at 135:4-10. After Scott received the written warnings, Legge didn't invite her to lunch with the other administrators. *Id.* at 113:15:23.

Scott faced additional challenges when she returned from maternity leave. Legge, the Area Projects Manager, informed Scott that she was upset that Scott had not discussed her pregnancy with her or other co-workers. Defs.' Ex. G; Defs.' Ex. A 114:1-117:2. Legge did not give Scott a procurement card; rather, Legge directed Scott to use Haygood's procurement card to make purchases. Defs.' Ex. A at 99:4-11. Nobody informed Scott what tasks were performed by the temp worker in her absence. *Id.* at 111:20-112:3. Legge also informed Haygood to tell Scott not to give any orders to the temp worker. *Id.* at 119:22-120:8.

Additionally, Legge informed Scott that she had to use vacation time in increments of thirty minutes rather than allowing her to make up missed time that equaled less than four hours. Defs.' Ex. G; Defs.' Ex. A at 101:7-14. Legge also began questioning Scott's vacation time and allowing only a select few to sign Scott's timesheets. Defs.' Ex. A at 119:10-14. However, Scott did receive all of the vacation time to which she was entitled. *Id.* at 119:15-18. Scott was also required to accurately record her time worked and told that she was taking longer than approved lunch breaks. *Id.* at 99:8-15. Moreover, Haygood would not allow Scott to make up any lateness at the back end or front end of her shift. Defs.' Ex. G; Defs.' Ex. A at 101:16-20.

Furthermore, Legge cancelled all administrative lunches. Defs.' Ex. A at 119:4-5. Legge and Haygood chastised Scott for failing to communicate with her co-workers, and required her to talk to her co-workers rather than send them emails. *Id.* at 99:22-100:3, 103:15-104:6. Legge

also told Scott to talk to an employee who she was having difficulty with.  *Id.* at 104:8-22.  Lastly, when the President came to town, Legge told everyone that they could go home early to avoid getting stuck in traffic.  *Id.* at 121:10-13.  However, she didn't notify Scott.  *Id.* at 121:14-18.

On July 28, 2010, Scott submitted a formal written complaint to Achenbach and Teresa Gavigan, the Director of Human Resources & Corporate Labor Relations.  *Id.* at 204:17-19.  In the complaint, Scott stated that she believed she had been subject to workplace bullying, discrimination, harassment, and violations of her privacy.  Defs.' Ex. G.  After receiving the complaint, Achenbach and Gavigan met with Scott to discuss her concerns.  Defs.' Ex. A at 205:2-6.  Achenbach performed an investigation and concluded that Scott had not been discriminated against.  *Id.* at 157:23-158:12, 207:9-19.  Achenbach verbally communicated this conclusion to Scott.  *Id.* at 207:9-19.  Scott requested that Achenbach provide her with written notes of the interviews she conducted and written findings of facts.  *Id.* at 158:13-18.  Achenbach never provided anything in writing to Scott.  *Id.* at 159:1-3.

On November 3, 2010, Scott received a third written warning concerning her excessive tardiness.  Defs.' Ex. F.  The warning noted that Scott had called Haygood on five occasions during the previous two months to inform him that she might be late for work due to traffic.  *Id.*  Additionally, the warning stated that Scott had been late for work on four days in September and October.  *Id.*  The warning was placed in Scott's personnel file.  Defs.' Ex. A at 135:11-13.  However, it did not affect Scott's salary, result in any change in benefits, or otherwise impact any of the terms and conditions of Scott's employment with Sunoco.  *Id.* at 135:4-10, 139:12-14.

On or about November 6, 2010, Scott went on sick leave of absence from Sunoco.  *Id.* at 139:15-19.  From approximately November 8, 2010 to April 28, 2011, Scott collected short-term

disability ("STD") payments from Sunoco. Defs.' Mot. at 12-13; Pl.'s Resp. at 9. While receiving STD payments from Sunoco, Scott interviewed for a job with Thomson Reuters. Defs.' Ex. A at 29:19-30:3. After her STD benefits expired, Scott remained on sick leave from Sunoco. Defs.' Ex. N. On May 2, 2011, Scott began working at Thomson Reuters as a tax analyst, even though she was still on the payroll at Sunoco. Defs.' Ex. A at 27:13-28:6. Effective June 15, 2011, Scott was placed on permanent leave of absence from Sunoco. Defs.' Ex. N. Sunoco logistics never fired Scott. Defs.' Ex. A at 133:10-12.

In August 2011, Scott received a letter from Sunoco dated August 2, 2011, informing Scott that she had been overpaid by $3,559.97. Defs.' Ex. A at 172:19-173:1; Defs.' Ex. O. The letter stated that Sunoco had made "numerous attempts" to reach Scott to discuss the matter, and requested that Scott contact Sunoco to "discuss your responsibility for repayment." Defs.' Ex. O. Scott received a second letter from Sunoco dated August 31, 2011, informing Scott that she had been overpaid by $3,559.97. Defs.' Ex. A at 174:16-18; Defs.' Ex. P. This letter also stated that Sunoco had made "numerous attempts" to reach Scott to discuss the matter, and requested that Scott contact Sunoco to "discuss your responsibility for repayment." Defs.' Ex. P. Scott never responded to either letter and made no payments to Sunoco. Defs.' Ex. A at 173:12-174:21 Scott has never attempted to ascertain whether she was overpaid, and admits that she does not know if Sunoco overpaid her. *Id.* at 173:17-174:5.

## II. LEGAL STANDARD

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law . . .

." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). After the moving party has met its initial burden, the nonmoving party must then "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. In ruling on a motion for summary judgment, the court must draw all inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the nonmoving party may not "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claims. *Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

In essence, the inquiry at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

### III. DISCUSSION

#### A. Disparate Treatment Claim

Scott alleges she was subject to disparate treatment because: (1) she was required to record her exact time worked; (2) she was informed that she was taking longer than approved lunch breaks; (3) she was not permitted to make up time she missed at work due to lateness; (4) she was told to communicate with other employees in-person rather than by email; (5) she had to

use vacation time in increments of thirty minutes, and had to use vacation time for short absences rather than being allowed to make up the missed time; (6) she did not receive a procurement card after returning from maternity leave, and had to use Haygood's procurement card; and (7) she was not promoted to the Administrative Assistant position.

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Where, as here, a plaintiff presents only circumstantial evidence of discrimination, the *McDonnell Douglas* burden-shifting framework applies. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999). "In *McDonnell Douglas*, the Supreme Court created a special scheme for structuring the presentation of evidence in discriminatory treatment cases under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1 et seq." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997). The *McDonnell Douglas* burden-shifting analysis proceeds in three steps. *Keller*, 130 F.3d at 1108. First, the plaintiff must establish a prima facie case of discrimination. *Id*. If the plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. "Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Jones*, 198 F.3d at 410. While the burden of production shifts at each step of the *McDonnell Douglas* analysis,

the plaintiff bears the burden of persuasion at all times. *Smith v. City of Allentown*, 589 F.3d 684, 689-90 (3d Cir. 2009).

In order to establish a prima facie case of disparate treatment, a plaintiff must establish that: "(1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). Sunoco concedes that Scott has established prongs one and two of a prima facie case. However, Sunoco argues that none of actions Scott suffered, with the exception of Sunoco's failure to promote Scott to the Administrative Assistant position, rise to the level of a legally cognizable adverse employment action.

In the context of a disparate treatment claim, "an adverse employment action is one which is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001) (internal quotation marks omitted). Put another way, an adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 152-53 (3d Cir. 1999) (internal quotation marks omitted). Additionally, an adverse employment action may be found "[i]f an employer's act substantially decreases an employee's earning potential and causes significant disruption in his or her working conditions . . . ." *Id.* at 153. Scott concedes that none of these actions rises to the level of an adverse employment action, but argues, without any citation to law, that in the aggregate these actions rise to the level of an adverse employment action. None of Sunoco's actions individually or combined, with the exception of its failure to promote Scott to the

Administrative Assistant position, significantly changed Scott's employment status, altered her benefits, disrupted her working conditions, or decreased her earning potential. Therefore, Scott's only potentially viable disparate treatment claim is that Sunoco discriminated against Scott when it failed to promote her to the Administrative Assistant Position ("Scott's Failure to Promote Claim").

### i. Scott's Failure to Promote Claim

Sunoco argues that Scott has failed to establish the fourth prong of her prima facie case of her failure to promote claim. Generally, to meet the fourth prong of a prima facie case of disparate treatment a plaintiff must establish that "the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Makky*, 541 F.3d at 214. Specifically, in the context of a failure to promote claim, a plaintiff may establish the fourth prong by showing that the position to which she applied and was rejected either: (1) remained open after her rejection and the employer continued to seek applicants with the plaintiff's qualifications; or (2) was filled by someone else who was chosen over the plaintiff. *Bray v. Marriott Hotels*, 110 F.3d 986, 990 n.5 (3d Cir. 1997). Sunoco alleges that Scott has not met the fourth prong of a prima facie case because she has not provided evidence to support an inference of discrimination. However, the evidence shows that Scott was qualified for the Administrative Assistant position, but Sunoco rejected her for the position and hired Joan Hassett, a white female, to fill the position. These facts are sufficient for Scott to establish her prima facie case.

Scott appears to concede, and the evidence supports, that Sunoco has articulated a legitimate nondiscriminatory reason for its failure to promote Scott to the Administrative Assistant position. Simply, Sunoco chose Hassett for the position rather than Scott because Hassett was the most qualified candidate for the job as demonstrated by her ten years of

12

experience as an administrative assistant in a corporate environment, and her prior budgeting experience. Sunoco has met its burden of production by articulating a legitimate nondiscriminatory reason for its failure to promote Scott. Thus, Scott's claim cannot succeed unless Scott can show by a preponderance of the evidence that Sunoco's legitimate nondiscriminatory reason for failing to promote Scott is a pretext for discrimination and not its true reason. *See Jones*, 198 F.3d at 410.

To establish that an employer's legitimate nondiscriminatory reason is pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). A plaintiff may prove pretext by presenting evidence under prong one or prong two. *Id.* "Thus, if the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons . . . , the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case." *Id.*

Scott argues, under prong one, that there is evidence from which a factfinder could reasonably disbelieve that Sunoco chose Hassett rather than Scott for the Administrative Assistant position because Hassett was the most qualified for the job.

"[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Id.* (citation omitted). As the Third Circuit has explained:

13

> To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons.

*Id.* at 765 (alteration in original) (citations omitted) (internal quotation marks omitted). "In simpler terms, [the plaintiff] must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Keller*, 130 F.3d at 1109. "[T]his standard places a difficult burden on the plaintiff . . . ." *Fuentes*, 32 F.3d at 765. "The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]." *Keller*, 130 F.3d at 1109 (alteration in original) (internal quotation marks omitted).

Scott provides the following terse explanation why a factfinder could disbelieve Sunoco's legitimate nondiscriminatory reason:

> The non-discriminatory reason for denial of [Scott's] application for the administrative assistant position was a pretext for discrimination because [Sunoco] could not and would not get back to Plaintiff after Plaintiff inquired about the difference between the position of administrative clerk and administrative assistant. Also, [Sunoco] would not honor or acknowledge [Scott's] inquiry as to the reasons that she was not hired for the position.

Pl.'s Resp. at 10-11. Disappointingly, Scott makes these factual assertions without any citation to the record. More importantly, the record does not even support these assertions. For instance, Scott states in her deposition that Sunoco told her that the difference between the Administrative Clerk position and Administrative Assistant position was that the Administrative Assistant position was higher and that is why Administrative Assistants were paid more than Administrative Clerks. Defs.' Ex. A at 62:7-14. Additionally, in an interrogatory response,

14

Scott states that Sunoco informed her that she was not hired for the Administrative Assistant position because "she did not have a finance background." Pl.'s Ex. A at 1(f). Regardless, even if these factual assertions were true, they do not "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions," *Fuentes*, 32 F.3d at 765, in Sunoco's proffered legitimate reason for its decision not to promote Scott. Scott has failed to provide evidence that Sunoco's legitimate nondiscriminatory reason for failing to promote her to the Administrative Assistant position is actually pretext for discrimination. Therefore, I will grant Sunoco's motion for summary judgment on Scott's disparate treatment claim.

**B. Retaliation Claim**

Scott alleges that Sunoco retaliated against her after she made a complaint in 2008, and again after she made a complaint on July 28, 2010. Specifically, Scott alleges that Sunoco subject her to the following retaliatory actions: (1) Sunoco supervisors told Scott to resolve her own conflicts; (2) Legge treated Scott differently; (3) Legge told Scott that she could not leave a note for the temp worker; (4) Scott's work hours were changed; and (5) Achenbach would not return Scott's calls when Scott inquired about the investigations into her complaints.

Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3. In order to establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in a protected employee activity; (2) she suffered an adverse employment action either after or contemporaneous with the employee's protected activity; and (3) a causal connection exists

between the employee's protected activity and the employer's adverse action. *Marra v. Phila. Housing Auth.*, 497 F.3d 286, 300 (3d Cir. 2007).

While Sunoco concedes that Scott engaged in a protected activity when she made her July 28, 2010 complaint, Sunoco argues that Scott did not engage in a protected activity when she complained in 2008 that she had been intimidated by Vernacchio. "A general complaint of unfair treatment is insufficient to establish protected activity under Title VII." *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006). "[O]pposition to an illegal employment practice must identify the employer and the practice-if not specifically, at least by context." *Id.* In *Barber v. CSX Distribution Services*, 68 F.3d 694, 701-02 (3d Cir. 1995), the Third Circuit held that a letter sent to an employer that complained about unfair treatment in general, but did not specifically complain about age discrimination was not protected activity. "The letter . . . was too vague to constitute opposition to an unlawful employment practice of his employer because it neither 'explicitly [n]or implicitly' alleged that a protected characteristic was the basis for the adverse employment action." *Curay-Cramer*, 450 F.3d at 135 (quoting *Barber*, 68 F.3d at 702).

In 2008, Scott complained to Sunoco that she had been intimidated by Vernacchio when Vernacchio came in her space and told her to do what she was told, regardless of the assignment. In her complaint, Scott never mentioned that she felt Vernacchio had discriminated against her on the basis of race or gender. This is because, according to Scott's own deposition, her 2008 complaint about the incident with Vernacchio was a "complaint of intimidation" and "was not a complaint of harassment or discrimination or retaliation." Defs.' Ex. A at 96:7-13. Scott never explicitly or implicitly alleged that Vernacchio's actions were motivated by race or gender discrimination. That is because, as admitted by Scott, it was only a complaint about

16

intimidation. Scott did not engage in a protected activity in 2008 when she generally complained of unfair treatment by Vernacchio. Therefore, the only protected activity that Scott engaged in was her July 28, 2010 complaint.

The second prong of a prima facie case of retaliation requires that a plaintiff suffered an adverse employment action after or contemporaneous with her protected activity. Sunoco argues that none of its alleged retaliatory actions took place after or contemporaneous with Scott's July 28, 2010 complaint. Sunoco is correct that all of its alleged retaliatory actions took place prior to Scott's protected activity,[4] with the exception of Scott's allegation that Achenbach retaliated against Scott when she refused to return Scott's calls during the investigation into the July 28, 2010 complaint. Therefore, the only alleged retaliatory action that may be considered is Achenbach's handling of the investigation that stemmed from Scott's July 28, 2010 complaint.

### i. Scott's Claim that the Handling of the Investigation into her July 28, 2010 Complaint was Retaliatory

The record does not substantiate Scott's allegation that Achenbach failed to return Scott's calls during the investigation into Scott's July 28, 2010 complaint. Scott does not cite to the record when making this allegation and nowhere in the record does this allegation appear. Rather, Scott states in her deposition that Achenbach verbally conveyed the conclusions of the investigation to Scott, but did not provide her with written copies of interview notes and findings of facts, even though she requested them. Sunoco argues that Achenbach's failure to provide written notes of the investigation to Scott is not an adverse employment action.

In the context of a retaliation claim, an adverse employment action is one that is "materially adverse, which . . . means it might well have dissuaded a reasonable worker from

---

[4] Further examination of these allegations is unnecessary because these alleged retaliatory actions took place prior to when Scott engaged in protected activity. However, I note the questionable veracity of some of these allegations, which Scott lists without citation to the record.

17

making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted). "We speak of *material* adversity because we believe it is important to separate significant from trivial harms." *Id.* The purpose of the antiretaliation provision is to prohibit employer actions that deter employees from making complaints of discrimination. *Id.* "And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id.*

Both the Second and Tenth Circuits have concluded that the failure to investigate a complaint of discrimination, where the protected activity the employee has engaged in is the filing of the very same complaint, is not an adverse employment action. *Daniels v. United Parcel Serv., Inc.*, No. 11-3211, slip op. at 38 (10th Cir. Dec. 11, 2012); *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010). This is because "a failure to investigate a complaint, unless it leads to demonstrable harm, leaves an employee no worse off than before the complaint was filed." *Daniels*, No 11-3211, slip op. at 38.

In Scott's case, Sunoco actually did conduct an investigation into her complaint and orally communicated its conclusions to her. What Scott alleges is retaliatory is Achenbach's failure to provide her with written conclusions and interview notes. Surely, if a total failure to investigate is not an adverse employment action then a failure to provide written notes and conclusions from an investigation is not an adverse employment action. While Scott may have desired written conclusions and notes, Achenbach's failure to provide them led to no demonstrable harm and is not an action that "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington,* 548 U.S. at 68. Scott cannot establish a prima facie case of retaliation. Therefore, I will grant Sunoco's motion for summary judgment on Scott's retaliation claim.

## C. Conversion and Unjust Enrichment Counterclaims

Sunoco brings claims of conversion and unjust enrichment against Scott, alleging that it mistakenly overpaid short term disability benefits to Scott and Scott did not return the overpayment. Sunoco moves for summary judgment in its favor on these counterclaims. The only evidence that Sunoco overpaid Scott are two letters Sunoco sent to Scott informing her that she had been overpaid by $3,559.97. Neither letter informed Scott that the overpayment was the result of Sunoco's overpayment of short term disability benefits.

In its motion for summary judgment, Sunoco fails to identify the essential elements of its claims. Without citation to any law, Sunoco argues that summary judgment should be granted in its favor on the counterclaims because Scott admits that she did not attempt to ascertain whether she has been overpaid, and promises to reimburse Sunoco if she has been overpaid. However, these admissions do not prove that Scott is liable for unjust enrichment or conversion. In her response to Sunoco's motion for summary judgment, Scott appears to concede that she was overpaid, despite the fact that Scott made no such concession on the record. While this concession is harmful to Scott's defense, Sunoco fails again in its reply to explain and provide record support that no genuine dispute of material fact exists as to any element of its claim for conversion or unjust enrichment. Therefore, I will deny Sunoco's motion for summary judgment in its favor on its counterclaims.

## IV. CONCLUSION

For the reasons set forth above, I will grant Sunoco's motion for summary judgment against Scott on all of her claims,[5] and deny Sunoco's motion for summary judgment in its favor on all of its counterclaims.

                                                    s/Anita B. Brody
                                        _____
                                        ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:    Copies **MAILED** on _____ to:

---

[5] Individual Defendants cannot be liable for aiding and abetting Sunoco's discrimination and retaliation in violation of the PHRA because Sunoco is not liable for discrimination or retaliation. The PHRA forbids "any person, employer, employment agency, labor organization or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice . . . ." 43 Pa. Stat. Ann. § 955(e). If the employer is not liable for any discriminatory practice then an individual employee cannot be held liable for aiding and abetting a discriminatory practice. *E.g., Unangst v. Dual Temp Co., Inc.*, No. 10-6811, 2012 WL 931130, at *9 (E.D. Pa. Mar. 19, 2012); *Eldeeb v. AlliedBarton Sec. Servs. L.L.C.*, No. 07-669, 2008 WL 4083540, at *11 (E.D. Pa. Aug. 28, 2008).